# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| USA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cm-00008-RK |
| | ) | |
| (1) CHARLES FLOYD ANDERSON, | ) | |
| (2) ROBERT PETE SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This matter comes before the Court pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure for alleged criminal contempt of Defendants Charles Floyd Anderson ("Anderson") and his attorney, Robert Pete Smith ("Attorney Smith"). The charges involve an underlying civil action wherein the Federal Trade Commission ("FTC") and the State of Missouri alleged that consumers paid over $110 million in response to deceptive sweepstakes and prize mailers distributed by a family business enterprise built by Anderson ("FTC Case"). The Government charges Defendants with criminal contempt for altogether failing to disclose (or sufficiently disclose) several entities, accounts, and transactions as ordered by a court in the FTC Case.

Many of the entities, accounts, and transactions that support the current criminal contempt proceedings involve Anderson and Attorney Smith acting as business partners or close friends, reaching far outside of the typical attorney-client relationship. The thrust of the Government's criminal contempt case focuses on the apparent effort undertaken by Attorney Smith to conceal that affiliation and wash himself and his business relationship with Anderson from the FTC disclosures. Anderson, as a lay person, had a duty to provide truthful, accurate, and complete information to the FTC. Attorney Smith and Anderson willfully violated both the letter and the spirit of the financial disclosure required by the district court in the FTC Case. After careful consideration and review, the Court **FINDS**, **ORDERS**, and **ADJUDGES** that Charles Floyd Anderson and Robert Pete Smith are **GUILTY** of criminal contempt as charged**.**

## Findings of Fact

On February 20, 2018, the FTC and State of Missouri ("FTC" or "FTC Plaintiffs")[1] filed the FTC Case in the United States District Court for the Western District of Missouri ("TRO Court") to obtain temporary, preliminary, and permanent injunctive relief against Kevin Russell Brandes, William Joseph Graham, and various companies they owned and operated (collectively, "FTC Defendants") from distributing allegedly deceptive sweepstakes and other prize mailers. *FTC v. Next-Gen, Inc., et al.*, No. 18-cv-00128-DGK. Brandes is Anderson's stepson and Graham is Anderson's son-in-law. Brandes and Graham acquired their mailer entities from Anderson in 2015. Anderson was later added as an FTC Defendant, to be discussed in further detail below.

### *Attorney Smith and Anderson's Relationship*

Attorney Smith,[2] a partner in the law firm of McDowell Rice Smith & Buchanan, P.C. ("McDowell Rice"), represented Anderson and his entities for over twenty-five years before the FTC Case. In addition to providing legal services to Anderson and his companies, Attorney Smith and Anderson were also longtime personal friends and investment partners. The two met in 1992 and became best friends, frequently socializing and vacationing together. (Tr. 751-52.)

In 1992 or 1993, Attorney Smith began representing Anderson's business entities, including at least three of which distributed allegedly deceptive sweepstakes and prize mailers throughout the world—Opportunities Unlimited Publications, Inc. ("OUP"); Contest America Publishers, Inc. ("CAP"); and Sweepstakes Reporter Co., Inc. (also known as AOSR Corporation) ("AOSR"). (Tr. 752.) From 1992 until 2016 or 2017, he represented the entities, which included (1) defending them from lawsuits and complaints brought by attorneys general and consumer protection agencies concerning alleged fraudulent conduct by their deceptive mailer schemes and (2) reviewing mailers for content which consumer protection regulators might deem objectionable.

During Attorney Smith's tenure as counsel to Anderson's entities, several states and localities lodged legal complaints against the various entities alleging fraudulent content of the mailers. For instance, Missouri, Florida, Kansas, Minnesota, and Washington took legal action against OUP and CAP for violations of their respective state laws concerning misrepresentations

---

[1] The FTC did a majority of the legal work in the FTC Case. For ease of reference, the Court refers to them collectively as the FTC.

[2] Attorney Smith is an experienced member of the bar. He received his juris doctor degree in 1970, and he has practiced law for over fifty-five years, specializing in commercial and civil litigation. (Ex. 2093, Tr. 747.) He began working at McDowell Rice in 1964 before attending law school.

2

in the mailers.[3]  (FTC Case, doc. 10, PX23 at ¶¶ 7-9, 11, 13.)  AOSR faced legal action from Missouri in 1998 and Johnson County, Kansas in 2012.  (*Id.* at ¶¶ 7, 10.)  Attorney Smith commonly negotiated settlements of these actions.

In 2015, Anderson sold the three entities to Brandes and Graham.  (Ex. 4.)  Attorney Smith continued representing the three entities; until, according to Attorney Smith, he "fired" Brandes and Graham in 2017 with respect to his legal review of the mailers because they ignored his legal advice concerning their content.  (Tr. 1036-37, 1044-45.)  However, as late as November 21, 2016, Attorney Smith was still representing the entities.[4]  (*see* Ex. 55 (November 21, 2016 letter from Attorney Smith vouching for the legality of AOSR's materials).)  At the bench trial, Brandes denied that Attorney Smith fired Brandes, Graham, or their companies.  (Tr. 1373.)  Each of the three entities were also FTC Defendants.

### *The FTC Case*

By the time the FTC Case was filed on February 20, 2018, counsel for Brandes, Graham, and Anderson had at least informally formed a joint defense agreement ("JDA" and "JDA Counsel").  While McDowell Rice had represented Brandes and his entities in the previous years, a different law firm—now Graves Garrett Greim LLC—represented Brandes and his entities in the FTC Case.[5]  (Ex. 45.)  JDA Counsel consisted of Graves Garrett Greim LLC (Brandes' counsel); Kennyhertz Perry, LLC (Graham's counsel); and McDowell Rice (Anderson's counsel).  As early as February 21, 2018, Attorney Smith began meeting and corresponding with JDA Counsel (even though Anderson was not yet an FTC Defendant), including, at a minimum: (1) a two-and-a-half hour meeting with Graham's counsel on February 21; (2) a twenty-minute phone call with Graham's counsel on February 22; (3) a brief phone call with Graham's counsel on February 27; and (4) a forty-minute and a twenty-minute call with Graham's counsel on February 28.  (Ex. 95.)

---

[3] OUP and CAP faced legal action from Minnesota in 1992; Missouri in 1993 and 2002; Kansas in 1995; Washington in 2002; and Florida in 2002, 2014, and 2016.  (FTC Case, doc. 10, PX23 at ¶ 7-9, 11, 13.)

[4] In addition, McDowell Rice provided legal representation to Brandes on other business and personal matters and had since the early 2000s.

[5] At some point before Brandes hired Graves Garrett Greim LLC, conflict waivers provided by McDowell Rice clarified that McDowell Rice would represent Anderson moving forward.  (Tr. 263-64, 299-300.)

A privilege log reflects email discussions between Attorney Smith and Anderson on March 13, 2018, as well. (Ex. 50.)

On April 20, 2018, the FTC served Anderson (still not yet an FTC Defendant) with a subpoena to produce documents in the FTC Case. (Ex. 48; Tr. 315-16.) The subpoena primarily requested information relating to Anderson's affiliation with FTC Defendants as well as entities under his control. (Ex. 48.) Attorney Smith and other McDowell Rice attorneys represented Anderson during the FTC Case, with Attorney Smith serving as lead counsel. (Tr. 257.) McDowell Rice delivered Anderson's subpoena response to the FTC. (*See* Ex. 51, 52.)

On July 17, 2018, the TRO Court issued a Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief ("TRO"). (Ex. 1300 at ¶ 2.) The TRO included, *inter alia*, an asset freeze and required that FTC Defendants complete certain individual and corporate financial disclosures to be provided to FTC Plaintiffs and the court-appointed Receiver, who was appointed by the TRO Court to administer the TRO and asset freeze.

On July 30, 2018, based upon the information Anderson provided to FTC Plaintiffs in response to the earlier subpoena, the FTC Plaintiffs sought leave to amend the complaint to include Anderson and his company, Montelago Marketing, Inc. ("Montelago"), as additional FTC Defendants. (Tr. 318; FTC Case, doc. 117.) The motion also sought to extend the TRO to apply to Anderson and Montelago.

Attorney Smith expected the TRO Court to grant the motion; so, McDowell Rice continued preparing their defense. In August 2018, while the motion for leave to amend remained pending, Attorney Smith (on behalf of Anderson) engaged in preliminary settlement discussions with counsel for the FTC, the Receiver, Brandes and Graham (and their associated companies). (Ex. 1300, Joint Stip. at ¶ 6.) As part of these settlement negotiations, Anderson agreed to provide completed financial statement forms and materials to FTC Plaintiffs. (*Id.* at ¶ 7.) McDowell Rice attorneys and Anderson's accountant, Chad Smith ("Accountant Smith"), began preparing the forms. Attorney Smith managed the production of the financial documentation and information, interpreting the TRO and disclosure requests and delegating some work to other McDowell Rice lawyers and Accountant Smith. (Ex. 1021, 2031, 2029.)

On September 24, 2018, the TRO Court issued an order granting in part and denying in part FTC Plaintiffs' motion for leave to file an amended complaint and to extend the TRO. (Ex. 62.) The TRO Court granted FTC Plaintiffs leave to file an amended complaint against Anderson

and Montelago, which was required to be filed within ten days of the Court's order, but it declined to completely extend the TRO to Anderson and Montelago, reasoning that the new defendants should have an opportunity to be heard on the issue. However, in light of the "unique circumstances" of the case and to "help deter the improper dissipation of assets and assist with accounting," the TRO Court ordered that Anderson and Montelago comply with the financial disclosure and foreign asset repatriation provisions within the TRO. (*Id.* at 11.) FTC Plaintiffs filed the amended complaint naming Anderson and Montelago as additional defendants on the same day, September 24, 2018. (FTC Case, doc. 203.)

On September 25, 2018, Anderson submitted to the FTC, through McDowell Rice, an Individual Financial Statement (signed by Anderson on September 21, 2018), including attached schedules and other materials, as well as a Corporate Financial Statement for Montelago.[6] (Ex. 19; Ex. 1300 at ¶ 8.) Anderson's Individual Financial Statement was prepared by Attorney Smith, other McDowell Rice attorneys, and Accountant Smith. (Tr. 619.) Anderson responded to questions and provided lists of assets, entities, etc., as well as documentation. And, in signing his Individual Financial Statement, Anderson certified that he (1) "used his best efforts to obtain the information requested in this statement"; (2) provided true and complete information of which he had notice; (3) "provided all requested documents in [his] custody, possession, or control"; and (4) was aware that he could be subject to penalties for false statements, including five years imprisonment and/or fines. (Ex. 19, 21.)

On October 12, 2018, FTC Counsel wrote to McDowell Rice, requesting follow-up information regarding Anderson's September 25 submission. (Ex. 26.) The FTC requested, *inter alia*, Corporate Financial Statements specifically for Anderson Family Partners, LLC; Aventura Properties, LLC ("Aventura");[7] "and any other entities that Anderson owns, controls, or manages." (*Id.*) McDowell Rice[8] responded on October 16, 2018, with an explanatory letter and supplemental

---

[6] Both the Individual and Corporate Financial Statements are preprinted FTC forms arranged by various items.

[7] Anderson's September 25 Individual Financial Statement claimed 100 percent ownership of these entities, as well as substantial interests in other LLCs. The FTC noted as much in the letter and reminded McDowell Rice that the TRO required Corporate Financial Statements for each entity owned, controlled or managed by Anderson.

[8] Attorney Smith drafted the letter; another McDowell Rice attorney who worked on Anderson's FTC matter, Kristie Orme, sent the response. (Tr. 1237, 1282.)

5

disclosures, including Corporate Financial Statements for Aventura; Flask, LLC; and Wingspan Way, LLC ("Wingspan Way"), as well as an updated Individual Financial Statement. (Ex. 21, 35.) In addition to Anderson's Individual and Corporate Financial Statements and attached schedules, he produced over 3,700 pages of documents to the FTC. Anderson reported a net worth of roughly $32 million.

In late 2018, the parties in the FTC Case reached a settlement. Anderson, Brandes, Graham, and their entities executed a stipulated judgment of $114,776,732, under which the FTC agreed to suspend payment upon the making of a $21,595,000 payment and transfer of real property, which stipulated settlement was "expressly premised upon the truthfulness, accuracy, and completeness of the Defendants' sworn financial statements and related documents." (FTC Case, doc. 263.) On March 13, 2019, the TRO Court issued a Stipulated Order for Permanent Injunction and Monetary Judgment in accordance with the parties' agreement. (FTC Case, doc. 264.)

***Criminal Contempt Proceedings***

On November 30, 2023, the Government petitioned this Court for an Order to Show Cause why Anderson and Attorney Smith should not be held in criminal contempt for violating the TRO. (Doc. 1.) The Court granted the petition and set the matter for a bench trial,[9] which was held between September 30, 2024, and October 7, 2024.

Specifically, in this criminal contempt proceeding, the Government alleges that the financial disclosures submitted by Anderson—as prepared by or with the involvement of Attorney Smith—omitted or failed to disclose the following entities, accounts, or transactions, each of which the Government maintains should have been disclosed in the financial statements as required by the TRO and otherwise ordered by the TRO Court in the FTC Case:

(1) the existence of SSL Nevada, LLC ("SSL Nevada"), an entity co-owned by Anderson and Attorney Smith, and its bank account;

(2) an entity swap between Anderson and Attorney Smith of two entities, PV Condo, LLC and AFP, LLC;

---

[9] The Court set the matter for a bench trial based upon the Government's representation that should Anderson and Attorney Smith be found guilty of criminal contempt, the Government did not intend to recommend a sentence of more than six months' imprisonment and no more than a $5,000 fine. *See Cheff v. Schnackenberg*, 384 U.S. 373, 379-80 (1966) (no constitutional right to jury trial for criminal contempt punished as a petty offense).

(3) Anderson's encumbrance and/or transfer of money for the purchase of a half-million-dollar 1968 Chevrolet Corvette by and as trustee for a family trust in early 2018; and

(4) a money market account jointly held by Anderon's wife and granddaughter, and bridge loan and mortgage associated with the purchase of the granddaughter's Raymore, Missouri, residence.

The Court includes relevant findings of fact as to each entity, account, or transaction, below.

***SSL Nevada, LLC***

Defendants formed SSL Nevada in 2001 as a Nevada limited liability company "to take title and hold title . . . for loans that were made by" Attorney Smith and Anderson. (Ex. 2001; Tr. 45, 827-28.) Attorney Smith and Anderson jointly owned the company in equal shares. (Ex. 77, folder 9 at 21; Tr. 45-47.) On December 14, 2001, Attorney Smith opened a bank account for SSL Nevada. (Tr. 854, 1116-17; Ex. 16.) Defendants co-owned the account which was used to fund and collect on the loans and to pay proceeds to Attorney Smith and Anderson.

As manager of SSL Nevada, Attorney Smith filed the required annual reports pursuant to Nevada law each year from 2001 to 2008. (Ex. 2003.) However, neither Attorney Smith nor Anderson filed SSL Nevada's required annual report in 2009. (*Id.*) On April 19, 2010, they were notified through SSL Nevada's registered agent that because SSL Nevada had not filed its annual report, SSL Nevada was in "default status" with the state of Nevada, and that if the report was not filed, the entity's charter would be revoked and its right to transact business forfeited under Nevada state law.[10] (Ex. 2002.) According to Attorney Smith, Defendants decided to stop filing SSL Nevada's annual reports. (Tr. 890.) However, Defendants did not formally dissolve the entity.

After the 2010 revocation, Defendants continued to make individual and personal loans in their own names and not in the name of SSL Nevada. (Tr. 832, 898.) They continued using the SSL Nevada bank account to collect on still-outstanding SSL Nevada loans and also to fund and collect on post-revocation loans (non-SSL Nevada loans).

From 2013 to 2018, more than $1.13 million flowed through the SSL Nevada bank account. At least $40,660.63 can be attributed to the remaining outstanding loans with SSL Nevada as

---

[10] Under Nevada law, an LLC is deemed to be in default if it fails to make its annual filing. Nev. Rev. Stat. § 86.272.1. And, "[o]n the first day of the first anniversary of the month following the month in which the filing was required, the charter of the company is revoked and its right to transact business is forfeited." Nev. Rev. Stat. § 86.274.2.

payee.  (Tr. 910, 914.)  During that time, Attorney Smith issued, and caused to be issued, coequal checks for loan payments to Anderson and himself, split evenly between the two of them.  (Ex. 77, folder 14; Tr. 47-50.)  On September 13, 2017, March 7, 2018, and June 12, 2018, Attorney Smith's secretary emailed him, advising that the SSL Nevada bank account had maintained a balance of roughly $12,585, and that the account was being assessed a small "account analysis fee" each month.  (Ex. 3013, 3014, 3016.)  In August 2018, $12,577.94 remained in the SSL Nevada bank account.  (Tr. 873.)

On August 12, 2018—while FTC Plaintiffs' motion for leave to amend remained pending—Attorney Smith asked his secretary to "zero out the account" and to split the balance between him and Anderson.  (Tr. 882-83.)  The following day, Attorney Smith received $6,289.27, and Anderson received $6,289.77.  (Ex. 76 at 444.)  When Anderson's financial disclosures were submitted to the FTC more than a month later on September 25, 2018, Attorney Smith believed the account balance was zero dollars.  (Tr. 885.)  As of September 25, 2018, however, the account held a balance of $97.03, which was the result of an automatic overdraft protection transfer of $100 from Attorney Smith's personal account to the SSL Nevada bank account after the account was emptied and a service charge was applied to the account.  (*Id.*)  Attorney Smith wrote a letter to Enterprise Bank to formally close the SSL Nevada bank account on October 8, 2018.

### *PV Condo, LLC and AFP, LLC*

In 2007, Attorney Smith and his wife, LesLee Smith, signed a contract to purchase a condominium in Puerto Vallarta, Mexico, that was not yet under construction.  (Tr. 916.)  The Smiths received possession of the condominium in 2009 or 2010, but, according to Attorney Smith, they did not receive title to it at that time due to a Mexican law which prohibited non-Mexican citizens from owning title of property within thirty miles of the ocean.  (Tr. 916-18.)

On March 25, 2014, LesLee Smith formed PV Condo, LLC.  (Ex. 23, Tr. 916-18.)  Attorney Smith testified that PV Condo, LLC was formed in order to take beneficial title to the Puerto Vallarta condominium because when the Smiths wanted to sell the condominium, they "could just sell the limited liability company."[11]  (Tr. 918, 1163.)  LesLee was designated as the registered agent.  (Ex. 23.)  On March 28, 2014, the Smiths opened a bank account for PV Condo, LLC—it was titled "PV Condo LLC" and the Smiths were both authorized signers.  (*Id.*)

---

[11] LesLee Smith was the 100 percent owner of PV Condo, LLC; however, Attorney Smith's testimony treated it as a joint ownership.

PV Condo, LLC obtained only beneficial ownership of (or beneficial title to) the Puerto Vallarta condominium via a fideicomiso trust in 2015. A fideicomiso trust is "an arrangement wherein a Mexican bank holds title to property and a foreign [entity] is granted the right to its use." *In re Icenhower*, 755 F.3d 1130, 1134 (9th Cir. 2014). On June 19, 2015, Attorney Smith directed a wire transfer from his PV Condo, LLC bank account to complete the Mexican title process. (Ex. 25, Tr. 64-65.)

According to Attorney Smith, in 2014, the Smiths decided they wanted to swap properties with Anderson and his wife, who owned a Missouri lake house through an entity, AFP, LLC. [12] (Tr. 948-49.) Attorney Smith decided that the properties could be swapped through a mutual transfer of their respective entities. The agreement was formalized on January 2, 2016. (Ex. 2050.) LesLee Smith transferred "her entire membership interest in PV Condo, LLC" to the Andersons "in exchange for [the Andersons] assigning to Pete and LesLee Smith . . . their 100 percent membership interests in AFP, LLC." (*Id.*) Attorney Smith drafted the two-page assignment.

On June 6, 2017, AFP, LLC sold the Missouri lake house for $775,000, and the proceeds were wired into the Smiths' personal bank account. (Tr. 955-67; Ex. 2057-59.) In 2021, the Puerto Vallarta condominium sold for $760,000 after Attorney Smith grappled to clear up the ownership documentation. According to Attorney Smith, the prospective buyers wanted to purchase the Puerto Vallarta condominium individually as beneficiaries of the Mexican trust, rather than by purchasing PV Condo, LLC. (Tr. 979.) Attorney Smith's testimony on the next point is somewhat unclear, but it appears he had not cleared up the original Mexican ownership records to show that ownership had transferred from the Smiths (individually) to PV Condo, LLC. Therefore, according to Attorney Smith, the Andersons were left with two options in order to sell the Puerto Vallarta condominium to the prospective buyers without transferring ownership of PV Condo, LLC: (1) complete formal transfer of beneficial ownership of the Mexican trust from the Smiths to the Andersons and again from the Andersons to the prospective buyers (a lengthy process); or (2) the Smiths could directly transfer ownership of the Mexican trust to the prospective buyers.

---

[12] Attorney Smith testified that he hoped to sell the Puerto Vallarta condominium. And, that based upon his experience obtaining beneficial title to the Puerto Vallarta condominium, he believed that the lake house—which purportedly had a similar value to the Puerto Vallarta condominium—would be easier to sell. (Tr. 949-51.)

(Tr. 979-80.) They decided to transfer ownership using the latter method, which required a recission of the sale of PV Condo, LLC (from LesLee Smith to the Andersons). (*Id.*)

***Backdated Purchase Agreement for a Luxury Car***

On January 21, 2018, one month before the original complaint in the FTC Case was filed, Brandes purchased a 1968 Chevrolet Corvette and issued a check for $495,000 from the checking account of his entity, B&G Auto Sales, Inc. ("B&G") to do so.[13] (Ex. 7.) The next day, January 22, 2018, Brandes "reimbursed" B&G with a check from the account of the DeDe Brandes Trust UTA Dated April 17, 2014 ("Trust").[14] (Ex. 6, 9.)

The Trust was created in 2014 to benefit Brandes' children and then-spouse, DeDe Brandes. (Ex. 6.) When the Trust was created, Anderson was the sole-designated trustee. Four days after the Trust's creation, Anderson added and designated Brandes as an additional trustee. Joe Harter ("Attorney Harter"), a senior partner with McDowell Rice, drafted the Trust.[15] (Tr. 1343.) The Trust documents provide that Brandes could serve as an additional trustee subject to a self-dealing provision (since Brandes was DeDe Brandes' then-spouse), under which Brandes could not act as trustee over distributions "or any other matter directly affecting him," making Anderson the sole trustee for such matters. (Ex. 6 at 4-5.)

On February 26, 2018, six days after the FTC Case was filed and one month after he purchased the Corvette and reimbursed B&G from the Trust, Brandes left a voicemail for Attorney Harter, relaying that he wanted to discuss the Trust and the purchase of the Corvette in light of the FTC Case. (Ex. 10.) Brandes explained that the Trust had loaned the money for the purchase of the Corvette, and Brandes wanted to make sure he had proper paperwork to protect the Trust from the FTC's reach. (Tr. 220.) Later that day, Attorney Harter emailed Brandes a draft promissory note and security agreement which provided for a loan from the Trust to B&G for the purchase of the Corvette. (Ex. 11.) The documents, however, were backdated to February 18, 2018, two days

---

[13] Brandes owned 50 percent of B&G, and Graham owned the other 50 percent of B&G. (Tr. 186.)

[14] The initial January 21 check lacked any notation relating to the Trust.

[15] Attorney Smith was the generating attorney for Brandes, meaning he was the one responsible for bringing Brandes' business to the firm. (Tr. 774.) Attorney Harter was the billing attorney who handled the majority of the work on Brandes' personal and business matters (as well as Graham's). For example, Attorney Harter also wrote the Brandes' estate planning documents in the early 2000s and facilitated the sale of several of Anderson's entities to Brandes and Graham in 2015. (Tr. 773; Ex. 49.) Attorney Harter was Brandes and Graham's point of contact at McDowell Rice. (Tr. 1306.)

before the FTC Case was filed.  Attorney Harter told Brandes that a UCC filing and notation of the lien on the title would perfect the Trust's lien on the Corvette.  (*Id.*)  Attorney Harter instructed: "Please send executed copies to me.  [Anderson] should hold the original Note and needs to sign the Security Agreement."  (*Id.*)

In accordance with the self-dealing provision of the Trust, Anderson's signature as trustee was required for the security agreement.  The security agreement is six pages long, and the final page contains only the signature page and no portion of the actual agreement text.  (Ex. 1089.)  Brandes testified that he facilitated the document exchange for Attorney Harter because Anderson was experiencing health problems and because he (Brandes) handled all of the Trust paperwork otherwise.  (Tr. 1380-82.)  Brandes' testimony about the document signing conflicted.  First, Brandes testified that on February 26 or 27, 2018, he showed both the promissory note and the security agreement to Anderson, in their entirety.  (Tr. 153, 185.)  Brandes testified that he told Anderson, "We got a good deal on a car for the kids' trust," (Tr. 153), and that the documents were drafted "for the protection of the trust, to protect its interests," (Tr. 185).  Later, the defense called Brandes back to the stand, and this time he claimed that he did not give Anderson the entire security agreement; rather, he only handed Anderson the signature page and asked him to sign it, that he did not review the agreement with Anderson, and that he did not leave Anderson with a copy of either the promissory note or the security agreement. (Tr. 1356.)  Either way, Anderson executed the security agreement as trustee and lender for the $495,000 loan the Trust made to B&G. (Ex. 1089.)

### Money Market Account and Purchase of Briann Brandes' Residence

On January 29, 2016, Anderson's granddaughter, Briann Brandes,[16] opened a money market account, jointly owned with her grandmother, Anderson's wife.  (Tr. 580-81; Ex. 81.)  The account was created so Briann Brandes could purchase a residence in Belton, Missouri, and she only used the account to pay her mortgage.  (Tr. 582-83.)  Briann Brandes testified that she had asked her grandmother to put her name on the account because she wanted her grandmother to have access to the account in case anything happened to her.[17]  (Tr. 582.)  The account was funded by Briann Brandes with a $54,200.44 balance comprised of proceeds from the sale of her previous

---

[16] Kevin Brandes is Briann Brandes' uncle.

[17] At the time, Briann Brandes was a single parent to two children.  (Tr. 582.)

home, along with a life insurance benefit she received from the death of her father. (Tr. 583-84.) The balance was used to pay Briann Brandes' monthly mortgage payments. (Ex. 39, found at Doc. 1-1 at 505.)[18]

In June 2018, Briann Brandes decided to sell her home in Belton, Missouri, and purchase a residence in Raymore, Missouri. (Tr. 586.) Anderson served as a cosigner and guarantor on Briann Brandes' residential loan of $181,600 to purchase the Raymore residence. (Tr. 89-90, 586; Ex. 40, 41, 1048.) In addition, on June 28, 2018, Anderson provided Briann Brandes with a bridge loan[19] in the loan amount from one of his personal accounts to facilitate closing. (Tr. 95-98; Ex. 76 at 1978-81.) A couple of weeks later, after the mortgage loan was funded, the money Anderson had loaned Briann Brandes for the bridge loan was repaid to his account through a series of credits between July 9 and July 19, 2018. (Tr. 95-98; Ex. 1049.) Briann Brandes held sole legal title in the Raymore residence. (Ex. 1052.)

### Conclusions of Law

The Government asserts that Attorney Smith and Anderson are guilty of criminal contempt under 18 U.S.C. § 401 because they willfully failed to comply with the financial disclosure provision of the TRO as applied to Anderson. Title 18 U.S.C. § 401(3) defines criminal contempt, in relevant part, as "[d]isobedience or resistance to [the court's] lawful writ, process, order, rule, decree, or command."[20]

To support a conviction for criminal contempt under § 401(3), the Government must prove each of the following three elements beyond a reasonable doubt: (1) the presence of a "clear and reasonably specific" order; (2) that defendants violated the order; and (3) that such violation was

---

[18] Briann Brandes continued to use this account for monthly mortgage payments even after she sold the Belton home and purchased a home in Raymore, Missouri. However, when the account was too low to make the April 2019 mortgage payment on the Raymore residence, Briann Brandes asked Anderson for assistance, and Anderson deposited $600 into the account. (Tr. 592.) No other substantial deposits were made into the account prior to April 2, 2019.

[19] A bridge loan is a short-term loan that assists home buyers with funding gaps to effectuate closing when their new home's closing date falls before the closing date for the sale of their old home. (Tr. 93-94.)

[20] As an alternative theory of contempt, the Government included in its Petition for Order to Show Cause a citation to 18 U.S.C. § 401(1), which makes punishable as criminal contempt "[m]isbehavior of any person in [the court]'s presence or so near thereto as to obstruct the administration of justice." There is certainly some question whether the role of the court-appointed Receiver equates to "in the court's presence," such that conduct before a Receiver is sufficient to support a criminal contempt conviction under § 401(1). However, because the Court finds Defendants guilty of criminal contempt under § 401(3), it need not decide that issue.

willful. *United States v. Rapone*, 131 F.3d 188, 192 (D.C. Cir. 1997) (internal quotation marks omitted). "Willfulness means a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of any order, and the necessary intent may be inferred from the evidence." *Wright v. Nichols*, 80 F.3d 1248, 1251 (8th Cir. 1996) (cleaned up). Conduct is an act of criminal contempt if "it was a volitional act done by one who knows or should reasonably be aware that [his] conduct is wrongful." *Id.* (quoting *In re Holloway*, 995 F.2d 1080, 1082 (D.C. Cir. 1993)).

Attorneys, however, are held to a higher standard of conduct than lay persons. *United States v. Cutler*, 58 F.3d 825, 837 (2d Cir. 1995) (citing *United States v. Turner*, 812 F.2d 1552, 1565 (11th Cir. 1987)). For that reason, willfulness in the context of criminal contempt may be inferred from an attorney's "reckless disregard for his professional duty." *Id.* (internal quotation marks omitted); *see, e.g.*, *United States v. Thoreen*, 653 F.2d 1332, 1342 (9th Cir. 1981). "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." Sup. Ct. R. Prof. Conduct Rule 4, Preamble. Of course, attorneys are ethically obligated to follow court orders. Sup. Ct. R. Prof. Conduct Rule 4-3.4.

The Government contends that Anderson and Attorney Smith violated the TRO by: (1) omitting the existence of SSL Nevada and its associated bank account from Anderson's Individual Financial Statement and by failing to provide a Corporate Financial Statement for SSL Nevada; (2) failing to fully disclose the entity swap of PV Condo, LLC and AFP, LLC in Anderson's Individual Financial Statement and by failing to provide a Corporate Financial Statement for PV Condo, LLC and AFP, LLC; and (3) failing to disclose the encumbrance of the Corvette and related distribution of trust proceeds by Anderson in his role as trustee in the required listing of transferred assets. The Government also contends that Anderson omitted the money market account jointly held by Briann Brandes and Anderson's wife and the bridge loan and mortgage associated with the purchase of the Briann Brandes' home in Anderson's Individual Financial Statement or the required listing of transferred assets. The Court addresses each claim below.

### I. SSL Nevada

The Government argues that Defendants violated the TRO by (1) failing to disclose SSL Nevada and its associated bank account under Item 6 (Employment Information/Employment

13

Income) and Item 9 (Cash, Bank, and Money Market Accounts) on Anderson's Individual Financial Statement, and (2) failing to complete a Corporate Financial Statement for SSL Nevada. The Court agrees.

Beginning with Anderson's Individual Financial Statement, Item 6 of the Individual Financial Statement required Anderson to:

> Provide the [company name and address, ownership interest status, dates employed, positions held, and income received] for *this year-to-date and for each of the previous five full years*, for each business entity of which you were a director, officer, member, partner, employee (including self-employment), agent, owner, shareholder, contractor, participant or consultant *at any time during that period*. Income includes, but is not limited to, any salary, commissions, distributions, draws, consulting fees, loans, loan payments, dividends, royalties, and benefits for which you did not pay (e.g., health insurance premiums, automobile lease of loan payments) received by you or anyone else on your behalf.

(Ex. 21 (emphasis added).) Thus, Anderson needed to report income received from SSL Nevada if he was a member of that entity at any time during the operative lookback period of 2013 to 2018. Item 9 required Anderson to list "all bank accounts" "whether held individually or jointly . . . or held by others for [his] benefit . . ." (*Id.*)

As to Item 6, Defendants argue that SSL Nevada was not an active or otherwise legally recognized entity in 2018 or at any time during the five-year lookback. It may well be that SSL Nevada was not a legally-recognized (i.e., active) entity by the State of Nevada after its charter was revoked by operation of state law on November 1, 2010. Even so, that did not stop Defendants from continuing to carry out business in the name of SSL Nevada, collecting outstanding residual assets (loan repayments and interest), distributing profits, and utilizing the SSL Nevada corporate bank account. At a minimum, after November 1, 2010, SSL Nevada continued (or at least held themselves out as) conducting business including by: (1) recording a UCC Financing Statement on March 2, 2011, (Ex. 96); (2) executing a Deed of Release as SSL Nevada on July 24, 2014 (within the five-year lookback period),[21] (Ex. 77, box 10, folder 2 at 24-27 (Attorney Smith signed as "manager" of "SSL Nevada")); (3) threatening foreclosure proceedings on an "SSL Loan" on November 4, 2013, (Ex. 77, box 10, folder 2 at 2); and (3) writing and cashing checks in the name of SSL Nevada, (Ex. 77, box 10, folder 1 at 35 (Lagerstrom check to "SSL Nevada, LLC" on

---

[21] The Deed of Release concerned an SSL Nevada loan to Mooning Over Broadway, LLC. Interestingly, at trial, Attorney Smith claimed that he was "not involved in [this loan] at all" and it was solely funded by Anderson. (Tr. 854.) The Deed of Release refutes that claim.

14

August 3, 2011) (Ex. 77, box 10, folder 2 at 20, 298 (Attorney Smith instructing his secretary to write checks from SSL Nevada on February 3 and October 5, 2015).) Anderson was a member/owner of SSL Nevada which continued its business during the five-year lookback period; therefore, he should have disclosed any income received during 2013 to 2018. It is undisputed that Anderson collected at least $20,000 in income (i.e., interest payments) from SSL Nevada loans during 2013 to 2018.[22] That income should have been reported on Item 6.

Moreover, the SSL Nevada bank account should have been disclosed on Item 9. Despite Attorney Smith's best efforts, the account was still open until at least October 8, 2018 (after Anderson's initial disclosures and 8 days before his supplemental disclosures). Defendants point out that at the time of Anderson's disclosures, Attorney Smith believed the account balance was $0 and, regardless, the account only contained $97.03. However, the only reason the account was almost empty was because Attorney Smith had finally directed the distribution of remaining profits on August 13, 2018. Attorney Smith did this because he knew that Anderson would soon become an FTC Defendant.[23] (Tr. 883.) The timing of Attorney Smith's attempted closure of the account indicates he intended to conceal the SSL Nevada account (and SSL Nevada, altogether) from the FTC.

Finally, the TRO required Anderson to prepare and deliver to FTC Counsel a Corporate Financial Statement "[f]or each business entity owned, controlled, or managed by [Anderson], regardless of whether it is a defendant in [the FTC Case]." (Ex. 56.) Defendants argue that SSL Nevada was not responsive to this reporting requirement of the TRO because SSL Nevada was a defunct entity in 2018. However, Defendants' argument ignores the language on the first page of the Corporate Financial Statement form (incorporated by reference in the TRO) which asked for the entity's present status—"Active," "Inactive," or "Dissolved," the date dissolved, by whom, and reasons for dissolution. (Ex. 44.) There is no doubt that Defendants were aware the form was required for inactive entities. They produced a Corporate Financial Statement for Aventura, an

---

[22] While Defendants argue that the SSL Nevada bank account received only $40,660.63 in interest payments from two outstanding loans (Bob Sands and Hood Plaza) from 2013 to 2018, on Anderson's tax returns during that period, he reported $25,079 on the Bob Sands SSL Nevada loan alone. (Ex. 1302.) Anderson and Attorney Smith equally owned SSL Nevada 50/50.

[23] Also in August 2018, while the motion for leave to amend was pending, Attorney Smith (on behalf of Anderson) was engaged in preliminary settlement discussions in which Anderson agreed to provide completed financial statements to FTC Plaintiffs.

inactive entity owned by Anderson, identifying it as "inactive" and its business activities as "none at present."[24]  (Ex. 92, Items 2 and 7; Tr. 1245 (Attorney Smith acknowledging they filled out a Corporate Financial Statement for Aventura because "even though it was an inactive entity, it still existed.").)  Coupled with the fact that Defendants continued collecting residual assets of SSL Nevada into 2018, and at the very least, held SSL Nevada out to be an active entity following its 2010 charter revocation, the Court concludes that Defendants should have known that they were required to produce a Corporate Financial Statement for SSL Nevada.  In fact, Defendants' production of a Corporate Financial Statement for Aventura and attempted closure of the SSL Nevada bank account convinces the Court that the failure to produce a Corporate Financial Statement for SSL Nevada was willful.

## II. Entity Swap of PV Condo, LLC and AFP, LLC

The Government also contends that Defendants failed to sufficiently disclose PV Condo, LLC by completing a Corporate Financial Statement for the entity or otherwise fully disclose the entity within Anderson's Individual Financial Statement.

Anderson's Individual Financial Statement (both his initial and supplemental forms)[25] as to Item 11 (Non-Public Business and Financial Interests) included a schedule which listed seventeen business interests, eight of which he identified as owning at least 50 percent: Flask, LLC (76 percent); A&B Partners, LLC (50 percent); Anderson Family Partners, LLC[26] (100 percent); Aventura Properties, LLC (100 percent); Wingspan Way, LLC (50 percent); C.F. Anderson Autos, LLC (100 percent); PV Condo, LLC (50 percent); and Montelago (100 percent).  Accountant Smith prepared the Item 11 schedule.  Anderson's initial disclosures included a Corporate Financial Statement only for Montelago.

---

[24] Anderson represented in the disclosure: "In 2015, Aventura sold its interest in [CAP] and [OUP] to companies that were owned by [Brandes and Graham].  Financial details of those transactions have already been furnished to the FTC."  (Ex. 92, Schedule 31.)

[25] Item 11 was not amended between the initial and supplemental forms, despite McDowell Rice's stated corrections in the October 16 letter to the FTC.

[26] According to Attorney Smith, Accountant Smith erroneously described AFP, LLC as "Anderson Family Partners, LLC" on the Item 11 Schedule.   (Tr. 967-72.)  Attorney Smith testified that after Anderson's initial Individual Financial Statement was produced, Attorney Smith learned that by listing "Anderson Family Partners, LLC" in Item 11, Accountant Smith intended to list AFP, LLC; simultaneously, Attorney Smith decided that the entity should not have been identified pursuant to Item 11 at all because Anderson no longer owned it.  (Tr. 967-72.)

16

On October 12, 2018, FTC Counsel requested supplemental information on several items from Anderson's initial disclosures. FTC Counsel wrote, *inter alia*:

> Section VI of the TRO also requires that "for each business entity owned, controlled, or managed by any Individual Defendant, regardless of whether it is a defendant in this case, the Individual Defendants shall also prepare and deliver to Plaintiffs' counsel and the Receiver a completed [Corporate Financial Statement]." Item 11 of Anderson's [Individual Financial Statement] includes among his nonpublic business interests a 100% ownership interest in Anderson Family Partners, LLC, a 100% ownership interest in [Aventura], and substantial interests in other LLCs. Please provide a completed [Corporate Financial Statement] form for Anderson Family Partners, Aventura [], and any other entities that Anderson owns, controls, or manages.

(Ex. 26.)

McDowell Rice's response (drafted by Attorney Smith) to the FTC's October 12, 2018 letter explained, *inter alia*: Anderson owned Aventura and Flask, LLC and would provide Corporate Financial Statements for those entities; A&B Partners, LLC's information was already submitted by Brandes (co-owner); C.F. Anderson Autos, LLC owned two of Anderson's personal cars which were listed elsewhere in Anderson's Individual Financial Statement; and

> D.      Wingspan Way, LLC is an entity that holds title to the Anderson's [sic] personal real estate at 10995 E. Wingspan Way, Scottsdale, Arizona. It is a disregarded entity for income tax purposes and files no tax returns. Its properties are included in the original submission in Item 18. Real Property and the ownership documents are included in Folder 18. Real Property; Wingspan Way, LLC also owns the Anderson's [sic] condominium unit 2001 at One Park Place, 700 W. 31st, and the revised personal financial statement of Mr. Anderson reflects that. We are also attaching a [Corporate Financial Statement] for Wingspan Way, LLC.
>
> E.      [Anderson] and his wife also owned Anderson Family Partners[27] that owned a personal residence in Sunrise Beach, Missouri at Lake of the Ozarks. That house was traded for a condominium in Puerto Vallarta, Mexico. The Sunrise Beach house was the only asset owned by Anderson Family Partners and in exchange for that house, [Anderson and his wife] received ownership of [PV] Condo, LLC which owns the Puerto Vallarta Condominium. (See paragraph F. below.) Thus, Anderson Family Partners was a prior real estate ownership only and we have not included a [Corporate Financial Statement] for it.
>
> F.      [PV] Condo, LLC is an entity that holds Beneficial Title to a personal condominium unit in Puerto Vallarta, Mexico. It is a disregarded entity for income tax purposes, files no tax returns, has no bank account and has no financial

---

[27] Because Attorney Smith wanted FTC Counsel to understand what issue he was responding to, Attorney Smith continued to identify what was actually AFP, LLC as Anderson Family Partners. (Tr. 974.)

statements.  This asset is scheduled as Real Estate in Item 18 of the original submission together with copies of the real estate documents in Folder 18.

(Ex. 35 (footnote added).)

The Court finds that this disclosure requirement can plausibly and reasonably be understood to require Corporate Financial Statements for entities that Andreson currently owned, controlled, or managed in 2018.  (*See* Ex. 26 (FTC Counsel also interpreting the TRO's requirement as present-owned entities by requesting Corporate Financial Statements for "entities that Anderson owns, controls, or manages").)  The record supports a finding that Anderson no longer owned AFP, LLC in 2018—the Smiths did.  Therefore, a Corporate Financial Statement was not required for AFP, LLC.  But Defendants should have prepared a Corporate Financial Statement for PV Condo, LLC.  Defendants argue that Anderson's disclosure of PV Condo, LLC under Item 18 of his Individual Financial Statement was sufficient as it was included in the submitted list of "all real property interests" which was explained in Attorney Smith's October 16 letter to FTC Counsel.[28]  The Court disagrees.

Defendants' partial disclosure of PV Condo, LLC did not provide anywhere near the scope of information that the FTC sought on the Corporate Financial Statement form.  The Corporate Financial Statement is a fifteen-page form which requested a myriad of information on thirty-two different items.  For example, the Corporate Financial Statement asked for information on PV Condo, LLC's legal status (incorporation date, entity status, business activities, etc.); registered agent; bank accounts; real estate holdings; "other" assets such as furniture; and entities holding assets in trust for the entity.  (Ex. 44 at 45-64.)

Moreover, while Anderson disclosed PV Condo, LLC on Item 18, the information that was included was not only inaccurate and unresponsive to Item 18, it was not the type or scope of information that would have been provided on a Corporate Financial Statement.  Item 18, "Real Property," requested Anderson list "all real property interests" along with information such as the type of property, names on title or contract and ownership percentages, acquisition date, purchase price, and current value.  The corresponding document request item asked Anderson to attach appraisals for the properties.  With respect to the property associated with PV Condo, LLC,

---

[28] Attorney Smith explained his reasoning to the FTC and provided Folder 18 to the FTC which included the legal documents for Anderson's real estate entities listed in Item 18, including the Mexican trust and property tax records for PV Condo, LLC.  (Ex. 76 at 3600-92 (93 pages written in the Spanish language).)

18

Anderson disclosed inaccurate title information, acquisition date, and purchase price. In his attached schedule for Item 18, Anderson listed seven properties, including a "Puerto Vallarta Peninsula Condominium, Unit 10D" which was purportedly titled under the names of Anderson and his wife and was acquired on July 1, 2014, for $700,000. PV Condo, LLC is not listed or identified; and it is not otherwise connected to the Puerto Vallarta condominium on the Individual Financial Statement.[29]

Insofar as document requests related to Item 18, Anderson's Individual Financial Statement requested he provide "all appraisals that have been prepared for real property listed in Item 18." Anderson did not provide appraisals but instead attached a folder containing deeds to the real properties listed, with the exception of the Puerto Vallarta condominium. For the Puerto Vallarta condominium, Anderson produced 93 pages of Mexican records documenting the fideicomiso trust. All 93 pages are in Spanish. Despite Defendants' claim on Item 18 that the Andersons held title to the Puerto Vallarta condominium, PV Condo, LLC is identified as the trustee. According to Attorney Smith, PV Condo, LLC had beneficial ownership of (or beneficial title to) the Puerto Vallarta condominium via the fideicomiso (not the Andersons). (Tr. 979, 1110.) Moreover, in Item 17 "Other Personal Property," Defendants disclosed the furniture in the Puerto Vallarta condominium but incorrectly listed the owner as the Andersons, when in fact, PV Condo, LLC owned the furniture. (*See* Tr. 1110.)

Also inaccurate is Anderson's stated purchase of the condominium on July 1, 2014, for $700,000. The entity swap was formalized on January 2, 2016. (Ex. 2050.) The Andersons acquired PV Condo, LLC (the *entity*) in exchange for their interests in AFP, LLC. While the condominium may well have been valued at $700,000, Item 18 specifically requested the purchase price.

---

[29] Although PV Condo, LLC is listed under Item 11's list of business interests, nothing connected PV Condo, LLC under Item 11 to the "Puerto Vallarta Peninsula Condominium" under Item 18. This deficiency is curious, because other entities of Anderson's which held title to real and personal property were both listed under Item 11's business interests wherein they were clearly linked by notation to other Items on Anderson's Individual Financial Statement, thereby delineating their assets. (*See* Ex. 21, Item 11 Schedule (listing Wingspan Way, LLC, which held title to several pieces of real property, and was denoted with a footnote explaining, "Assets listed on Real Estate Schedule – see Item #18") (listing C.F. Anderson Autos, LLC, which held title to personal vehicles, and was denoted with a footnote explaining, "Assets listed on Vehicles Schedule – see Item # 16").)

Insofar as Defendants also suggest that Attorney Smith's crafted explanation of the AFP, LLC and PV Condo, LLC swap in the October 16 letter to the FTC cured any defect in Anderson's disclosure, the Court finds that Attorney Smith's explanation was similarly inaccurate, unresponsive, and lacking in any acceptable detail.

Ultimately, Defendants' disclosure of PV Condo, LLC on Items 11, 18, or elsewhere did not satisfy the requirement that Anderson produce a Corporate Financial Statement for PV Condo, LLC. By refusing to produce a Corporate Financial Statement for PV Condo, LLC despite a clear and specific order to do so, Defendants violated the TRO.

Moreover, Attorney Smith's preparation of the disclosures demonstrates that the violation was undoubtedly purposeful and willful.[30] Attorney Smith drafted and possessed the two-page agreement evidencing the January 2, 2016 entity swap wherein LesLee Smith transferred her ownership interest of PV Condo, LLC to the Andersons, and the Andersons transferred their ownership in AFP, LLC to the Smiths. (Ex. 2050.) Rather than produce to the FTC this succinct document (written in the English language) which actually establishes the Andersons' ownership of PV Condo, LLC (as well as their acquisition date and purchase price of the Puerto Vallarta condominium as requested by Item 18), Attorney Smith (on behalf of Anderson) produced *only* the 93-page Spanish fideicomiso trust documentation. They still did not produce a Corporate Financial Statement for PV Condo, LLC, even after FTC Counsel reminded Attorney Smith of the requirement to do so. Instead of simply preparing a Corporate Financial Statement (or, at a minimum, providing the entity swap agreement to the FTC), Attorney Smith embarked on a careful drafting exercise to artfully explain Anderson's ownership of PV Condo, LLC whilst removing any mention of the Smiths.

Three of Attorney Smith's draft response letters to the FTC's October 12, 2018 request for additional information were admitted at trial. (Ex. 27-32.) Initially, on Sunday, October 14, at 2:02 p.m., Attorney Smith's draft stated that Anderson would submit a Corporate Financial Statement for PV Condo, LLC.[31] (Ex. 27, 28.) Attorney Smith's draft grouped the explanation of

---

[30] Attorney Smith's testimony that he produced all documents in existence that concerned PV Condo, LLC to the FTC (the 93 pages written in Spanish) is belied by numerous exhibits admitted at trial including, but not limited to: PV Condo, LLC's articles of incorporation; PV Condo, LLC's bank account information; entity swap documentation, and documents illustrating PV Condo, LLC's change of registered agent. (Tr. 940.)

[31] In addition, Attorney Smith stated he would provide a Corporate Financial Statement for "Anderson Family Partners, LLC." Attorney Smith's initial draft response letter indicates his belief that

Wingspan Way, LLC and PV Condo, LLC together, noting their similarities—both entities (owned by Anderson) held title (PV Condo, LLC held beneficial title rather than legal title) to personal real estate; both were disregarded entities for tax purposes and did not file tax returns; both were included in Anderson's original Individual Financial Statement with real property and ownership documents already produced. (Ex. 28.) Attorney Smith concluded the explanation: "We are also attaching a [Corporate Financial Statement] for these two entities." (*Id.*)

After sending the first draft to Attorney Orme for formatting, Attorney Smith began working on PV Condo, LLC's Corporate Financial Statement. (*Compare* Ex. 1032 (requesting information from Accountant Smith which the Corporate Financial Statement required for PV Condo, LLC and other entities at 3:57 p.m. on October 14) *with* Ex. 44 at 45-59 (example of Corporate Financial Statement).) In doing so, Attorney Smith realized that his wife was still the registered agent for PV Condo, LLC—a fact that would have to be disclosed on the first page of PV Condo, LLC's Corporate Financial Statement. (Ex. 44 at 46.) Therefore, Attorney Smith tasked his paralegal with changing the registered agent from LesLee Smith to Anderson. (*See* Ex. 33 at 2.) Then, at 8:46 a.m. on October 15, Attorney Smith sent an updated draft letter to Attorney Orme which removed indication that Anderson would file a Corporate Financial Statement for PV Condo, LLC. (Ex. 29, 30.) Later that day or the next (October 15 or 16), Attorney Smith provided the final draft response to Attorney Orme which this time included Paragraph E (set forth *supra*), partially explaining Anderson's prior ownership of Anderson Family Partners, LLC (AFP, LLC) and the entity swap with PV Condo, LLC. (Ex. 32; Tr. 973.) Attorney Smith did not, however,

---

Anderson owned Anderson Family Partners, LLC at that time and he would provide the Corporate Financial Statement. (Ex. 30; Tr. 970-71.) Attorney Smith "assumed [Accountant Smith's Item 11 schedule] was accurate and that [Anderson Family Partners, LLC] was something [Anderson] owned" that Attorney Smith was not privy to. (Tr. 970-71.) It was not until after this draft letter was created that Attorney Smith inquired with Accountant Smith about Anderson Family Partners, LLC and learned that it was the same entity as AFP, LLC but was erroneously identified as Anderson Family Partners, LLC. (Tr. 967-72; *see* Ex. 1032 (October 14, 2018, 3:57 p.m. email from Attorney Smith to Accountant Smith asking whether Anderson Family Partners, LLC (and PV Condo, LLC, among other entities) had (1) a bank account within the previous five years and to provide full statements if so; (2) a credit card; (3) a federal tax identification number; (4) a prepared financial statement in the past five years; and (5) made any transfers over $2,500 other than in the ordinary course of business).)

In Attorney Smith's next draft response letter, Attorney Smith scratched out "does own Anderson Family Partners" because when he asked Accountant Smith about the entity, Attorney Smith "discovered that that was the lake house that had been owned by AFP, LLC that had been transferred to me a couple years earlier and that I had sold. And so, he was listing that on there when it shouldn't have been listed on there." (Ex. 31; Tr. 971-72.)

include any indication that the entity swap that was the subject of this disclosure was with Attorney Smith's de facto entity or was in any way affiliated with Attorney Smith's personal interests. The Statement of Change of Registered Agent for PV Condo, LLC was filed on October 15, the day before the response letter and supplemental disclosures were sent to the FTC, but Attorney Smith also did not include this information in his explanation of the entity swap. (Ex. 33.)

Also concerning is Defendants' differential treatment of Wingspan Way, LLC and PV Condo, LLC despite their similarities, many of which Attorney Smith recognized in the initial draft response letter to the FTC. Both were entities which held title or beneficial title to personal real estate that Anderson utilized. Both entities also owned other assets such as furniture and funds held in escrow. (Tr. 1110 (PV Condo, LLC owned the furniture inside of the condominium); Ex. 23 (PV Condo, LLC bank account opened in 2014); Ex. 80 (PV Condo, LLC bank account operating through February 2017); Ex. 84 (Wingspan Way, LLC Corporate Financial Statement, Items 20, 22, 24).) The Corporate Financial Statement specifically asked about these types of assets, refuting Attorney Smith's claimed interpretation that a Corporate Financial Statement was an unsuitable mechanism by which to disclose PV Condo, LLC. (*See* ex. 44 (Item 2 listing Wingspan Way, LLC's business activities as "ownership of personal real estate") (Item 20 "Cash, Bank, and Money Market Accounts") (Item 22 "Real Estate" ("List all real estate . . . held by the corporation" and requiring names on title, financial information, etc.) (Item 23 "Other Assets" ("List all other property . . . with an estimated value of $2,500 or more, held by the corporation, including but not limited to . . . furniture . . .") (Item 24 "Trusts and Escrows" ("List all persons and other entities holding funds or other assets that are in escrow or in trust for the corporation").) Although PV Condo, LLC and Wingspan Way, LLC were similar, and both owned other assets, Anderson only produced a Corporate Financial Statement for Wingspan Way, LLC.

In addition, the Court agrees with the Government's contention that Anderson should have disclosed Attorney Smith as transferee of AFP, LLC, in his Individual Financial Statement pursuant to Item 23 (Transfers of Assets), which required Anderson to:

> List each person or entity to whom you have transferred, in the aggregate, more than $5,000 in funds or other assets during the previous five years by loan, gift, sale, or other transfer (exclude ordinary and necessary living and business expenses paid to unrelated third parties). For each such person or entity, state the total amount transferred during that period.

(Ex. 21.) The entity swap was formalized on January 2, 2016—plainly falling within the five-year lookback period of Item 23.

Ultimately, Attorney Smith's advice and overall production of PV Condo, LLC was dishonest. The commonality between the nondisclosures and conduct detailed above is that each allowed Attorney Smith to remove not only any mention of the entity swap, but also any indication of the affiliation of Attorney Smith or his wife with PV Condo, LLC. Attorney Smith withheld documents which pointed towards him, and the documents he did produce (and his explanations) were unresponsive, confusing, and they deliberately obscured his connection to PV Condo, LLC. (*See* tr. 933-37.) But Anderson is not without fault. By signing and submitting his disclosures to the FTC, he certified that they were true and complete. They plainly were not. And the defects were significant such that there is no question Anderson knew or should have known the disclosures were incomplete and untrue when he signed them.

### III. Backdated Purchase of a Luxury Car

Third, the Government alleges that Defendants violated the TRO by failing to disclose the encumbrance of the Corvette as well as the withdraw and/or transfer of Trust proceeds for the associated loan.[32] In this regard, the TRO provides:

> [T]o the extent not already disclosed[,] . . . [e]ach Defendant shall provide Plaintiffs' counsel and the Receiver a list of all assets valued over $1,000 transferred, liquidated, converted, encumbered, pledged, loaned, sold, assigned, spent, withdrawn, or otherwise disposed of since the date of the filing of the Complaint in this action[.]

(Ex. 56 (emphasis added).)

Brandes purchased the Corvette with a $495,000 check from the B&G checking account on January 21, 2018. The next day, on January 22, Brandes reimbursed B&G with a check from the Trust. On February 26, 2018, over a month later and six days after the FTC Case was filed, Brandes and Attorney Harter (Attorney Smith's law partner) worked in concert to backdate a promissory note and security agreement, reflecting a false February 18 transaction date—two days before the FTC Case was filed. This required Anderson's signature as trustee on the security agreement.

---

[32] Brandes also did not disclose the Corvette purchase. He testified at the bench trial that he believed the Corvette transaction had been disclosed in the FTC Case in his financial disclosures because he told his attorneys about it. It was only after the FTC Case settled, however, that it was discovered that Brandes' attorneys had inadvertently omitted the Corvette transaction from Brandes' disclosures. (Tr. 1368-69; Ex. 5000-02.)

Defendants have not contested that the backdating of the Corvette's promissory note and security agreement was purposeful and willful and they have not contested that in doing so Brandes intended to shield the asset from the FTC. Neither do Defendants dispute Anderson's role in this transaction as trustee, but instead they suggest that he was not required to disclose the Trust's encumbrance or loan because he did not fund, or benefit from, the Trust. However, the TRO defined "asset" to mean "any *legal* or equitable interest in, right to, or claim to, any property, wherever located and *by whomever held*." (Ex. 56 at 3 (emphasis added).) A "trustee is the legal owner of the trust property, in which the beneficiaries have equitable ownership." *US Bank, N.A. v. Smith*, 470 S.W.3d 17, 24 n.4 (Mo. Ct. App. 2015) (internal quotation marks omitted). The backdated transaction was plainly fraudulent. Had the security agreement and promissory note accurately reflected the Corvette transaction as January 21 or 22, 2018, the plain language of the TRO would have required Anderson's disclosure of the encumbrance of the Corvette by the Trust and the loan of $495,000 by the Trust. Even Attorney Smith testified that he "didn't like that there was a document that appeared to be backdated two days before [Brandes] was sued," and "it looked to [him] like someone was doing something . . . whether it's crooked, illegal, untoward, bad, that's what it looked like to [him] when [he] saw it" in 2022.[33] (Tr. 1310-11.)

Defendants argue that any violation of the TRO by failing to disclose the backdated transaction was not willful for two distinct reasons. First, Anderson argues that despite his signature on the security agreement, he was minimally involved in the transaction or at least unaware of the nature of the transaction, and Attorney Smith asserts that he didn't learn about the transaction until 2022. The Court is not convinced. The Court finds Brandes' testimony that Anderson was not apprised of or involved in the transaction as not credible. Brandes' testimony itself was conflicting. First, Brandes testified that on February 26 or 27, 2018, a week after the FTC Case was filed, he showed both the promissory note and the security agreement to Anderson, in their entirety. (Tr. 153, 185.) Brandes testified that he told Anderson, "We got a good deal on a car for the kids' trust," (tr. 153), and that the documents were drafted "for the protection of the trust, to protect its interests," (tr. 185), undeniably indicating Anderson's knowledge that the backdated instruments were intended to shield the Corvette from the FTC's purview. It was not

---

[33] In late 2021 and 2022, the United States Attorney's Office notified Anderson that he was under federal investigation. Anderson and Attorney Smith began receiving subpoenas seeking information related to their conduct in the FTC Case.

until Brandes was called to testify again later at trial by the defense that he claimed he did not give Anderson the entire security agreement; rather, he only handed Anderson the signature page and asked him to sign it, that he did not review the agreement with Anderson, and that he did not leave Anderson with a copy of either the promissory note or the security agreement. (Tr. 1356.) Brandes' former testimony is more believable considering that in 2022, Anderson had a copy of the security agreement which he gave to his defense attorney and told him (the attorney) that Brandes gave it to him. (Tr. 1051-52.)

Either way, the notion that Anderson was unaware of the nature or effect of the backdated Corvette transaction is implausible. While Anderson was not yet a defendant in the FTC Case, he was aware (as was Attorney Smith) of the FTC Case as well as their extensive history and involvement with the FTC Defendants when the backdated Security Agreement was prepared on February 26, 2018. Anderson and Attorney Smith were actively involved in the FTC case as soon as it was filed on February 20, 2018, and Attorney Smith was actively meeting with other JDA Counsel in preparation for the FTC Case. At a minimum, compliance with the April 2018 subpoena (about a month later, which sought transactions and information related to Anderson's relationship with the FTC Defendants) would have alerted Anderson to the significance of, and the need to disclose, the backdated Corvette transaction later in his financial disclosures he eventually submitted.[34] Anderson signed the security agreement a week after the FTC Case was filed—during a critical time that he would have been significantly attentive to large financial decisions, especially one involving a named FTC Defendant *who expressed to him an intention to shield the half-a-million dollar asset from the FTC*.

Attorney Smith claims that Anderson did not tell him about the backdated Corvette transaction and he was otherwise unaware of it until the investigation of this criminal contempt case in 2022. It may be true that Anderson did not apprise Attorney Smith of the backdated

---

[34] The Government asserts that Anderson also should have disclosed the encumbrance pursuant to the April 2018 subpoena issued to him. Given the Court's finding that Anderson should have disclosed the backdated transaction pursuant to the TRO, the Court declines to consider this argument given the lack of notice of a charge related to violation of the subpoena. The Government's show cause order alleged only violations of the TRO. *See United States v. Mann*, 701 F.3d 274, 308 (8th Cir. 2012) ("A variance occurs when the essential elements of the offense set forth in the indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment," and such "variance implicates the defendant's Sixth Amendment right to notice of the nature of the charge[.]" (cleaned up)). However, the preparation of the subpoena response is relevant to what Anderson and Attorney Smith knew prior to Anderson's financial disclosures later in 2018.

transaction in 2018; however, the Court is skeptical that Attorney Smith was not aware of the transaction. Attorney Smith was the nexus within McDowell Rice (and the JDA) concerning the FTC Defendants. Attorney Smith testified that Anderson "has memory problems" and that he "hasn't had a very good memory for a number of years." (Tr. 1060.) Attorney Smith's law partner, Attorney Harter, drafted the backdated documents. Attorney Smith, as the referring attorney, was no doubt aware of Attorney Harter's history and involvement with Anderson, Brandes, Graham, and their business entities before and during 2018. Attorney Harter, as the point of contact for Brandes and Graham at McDowell Rice, would have clearly been the resource to ask about contracts and agreements with them or their entities (important for the April subpoena) as well as for trustee transactions by Anderson, given he drafted the Trust.

And, Attorney Orme worked under Attorney Smith's direction in responding to the FTC subpoena and later financial disclosures. According to Attorney Smith, she was "very thorough" and "always did everything right." (Tr. 1177-78.) Attorney Smith testified that in gathering responsive information for the April 2018 subpoena, Attorney Orme "made sure that she tried to find every record we had. She talked to [Attorney] Harter. She got [Attorney] Harter's records. And, I believe that she produced those as part of that subpoena to [Anderson]." (Tr. 1126.) The trial record shows that Attorney Smith was frequently reviewing and revising Attorney Orme's drafted FTC responses and disclosures and she incorporated those revisions at Attorney Smith's direction. (*See* Tr. 1051, 1053, 1157-59.) Finally, Attorney Smith collaborated with other JDA Counsel in representing Anderson in the FTC Case, including Brandes' attorneys, who in 2018 were aware of the Corvette transaction. (*See* ex. 5002.)

At best, Attorney Smith failed to consult with his law partners, client, and/or other JDA Counsel about Anderson's recent financial activity with the other FTC Defendants. The Court is convinced that that failure to consult, even if true, was a deliberate attempt to sustain some bit of plausible deniability as to Anderson's transactions and involvement with the FTC Defendants. Had Attorney Smith done any due diligence, he would have discovered the backdated transaction and Anderson's involvement therein. Notwithstanding, Attorney Smith's knowledge is frankly immaterial—Attorney Smith testified that even if he had known about the backdated transaction in 2018, he would not have disclosed it to the FTC because he did not believe it was an asset of Anderson's. (Tr. 1191-92.) As discussed *supra*, that interpretation is plainly incorrect based on the TRO's definition of an "asset." Thus, Attorney Smith was either willfully blind to the

26

backdated transaction, or he knew about it but nevertheless advised nondisclosure based on an implausible interpretation of the TRO. Either way, Attorney Smith at least recklessly disregarded his professional duties as an attorney to ensure that the TRO was followed. *See Cutler*, 58 F.3d at 837. From that, the Court infers Attorney Smith's willfulness for purposes of finding criminal contempt.

Finally, Defendants argue that any nondisclosure of the Corvette transaction was not willful because the controlling start date for this particular section of the TRO is plausibly and reasonably subject to differing interpretations, at least as applied to Anderson. On September 24, 2018, the TRO Court issued its order granting FTC Plaintiffs' motion for leave to file an amended complaint against Anderson and in part granting FTC Plaintiffs' motion to apply the TRO to Anderson. (Ex. 62.) That order required Anderson and Montelago to comply with the financial disclosure provision within the TRO. (*Id.* at 11 (order referring to the TRO without any modification of the TRO's language).) In this regard, the TRO provides:

> [T]o the extent not already disclosed[,] . . . [e]ach Defendant shall provide Plaintiffs' counsel and the Receiver a list of all assets valued over $1,000 transferred, liquidated, converted, encumbered, pledged, loaned, sold, assigned, spent, withdrawn, or otherwise disposed of *since the date of the filing of **the Complaint** in this action*[.]

(Ex. 56 (emphasis added).)

Attorney Smith contends that he interpreted "since the date of the filing of the Complaint in this action" to mean the date that the Amended Complaint was filed against Anderson (September 24, 2018), rather than the filing date of the initial Complaint (February 20, 2018). Based on this interpretation, Attorney Smith advised Anderson to disclose assets valued over $1,000 that were "transferred, liquidated, converted, encumbered, pledged, loaned, sold, assigned, spent, withdrawn, or otherwise disposed of" only after September 24, 2018.[35]

Considering that a conviction for criminal contempt requires a showing of a willful violation of the TRO, an alleged contemnor's "good-faith compliance" with the order is a defense

---

[35] Attorney Smith advised this in general as to Anderson's assets as a whole in an email to Anderson:

See below [(referring to quoted TRO language)]. I am working on this now and it is due next Tuesday. . . . [The TRO] wants transfers of $1,000 or more since the filing of the Complaint which was filed against you on 9/24/18. Have you done any of the things described . . . since 9/24/18?

(Ex. 1028.)

to a charge of criminal contempt. *In re Kendall*, 712 F.3d 814, 831 (3d Cir. 2013). In other words, an alleged contemnor will be found not guilty of criminal contempt "if the defendant's alleged disobedience is consistent with a reasonable interpretation of the court's order (albeit an interpretation different from the one applied by the court imposing the contempt), and there is no other evidence of willfulness . . . ." *Doral Produce Corp. v. Paul Steinberg Assoc., Inc.*, 347 F.3d 36, 38-39 (2d Cir. 2003); *see also Waste Conversion, Inc. v. Rollins Env't Servs.*, 893 F.2d 605, 609 (3d Cir. 1990) ("Willfulness, for the purpose of criminal contempt, does not exist where there is a good faith pursuit of a plausible though mistaken alternative." (cleaned up)).

"To provide a defense to criminal contempt . . . [a] mistaken construction must be one which was adopted in good faith and which, given the background and purpose of the order, is plausible." *Waste Conversion*, 893 F.2d at 609. Ultimately, "the court should consider the entire background behind the order," such as "the conduct that the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings," in deciding "whether the defendant knew or should have known that his conduct was wrongful." *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974).

Even if the Court could find that Defendants' interpretation of the TRO was taken in good faith, it was not plausible given the background and purpose of the TRO. The TRO Court's order applying the TRO financial disclosure provisions to Anderson and Montelago cited directly to the roughly two-page portion of the TRO it sought to enforce. As stated above, the pertinent financial disclosure provision required disclosure of certain assets "since the date of the filing of the Complaint in [the FTC Case]." (Ex. 56 at 10.) As Attorney Smith was aware, the TRO Court could have modified the compliance dates for Anderson and Montelago, but it chose to leave the language referring to "the Complaint" as originally present. Moreover, in applying the financial disclosure provisions of the TRO to Anderson and Montelago, the TRO Court explained that Anderson's "compliance will help deter the improper dissipation of assets and assist with accounting." (Ex. 62.)

Anderson was on notice that he was being investigated as part of the FTC case *at least* as early as its filing, well before the FTC Plaintiffs moved for leave to amend their complaint and apply the TRO to Anderson. In fact, Attorney Smith believed that early and voluntary disclosures would help Anderson's position in settlement negotiations with the FTC, so he was actively

28

working on Anderson's financial disclosures while waiting on the TRO Court's decision (which Attorney Smith believed would add Anderson to the FTC Case). (Tr. 760.) Thus, Anderson had a possible incentive to transfer or conceal assets at least as early as the FTC Case was filed. In order to enjoin Anderson from squandering assets and to ensure proper accounting of assets with respect to *all* of the FTC Defendants, the TRO's scope as applied to Anderson would certainly include his financial disclosures from filing of the Complaint on February 20, 2018. Anderson's involvement did not begin later than Brandes and Graham's (in fact, Anderson was the genesis of the business enterprise), it just happened that the FTC was not fully aware of his role until after reviewing his responses to the April 2018 subpoena. Therefore, considering the conduct that the TRO was meant to secure and interests it sought to protect, i.e., to assess and safeguard available restitution, the Court finds Attorney Smith's interpretation of the controlling start date of this TRO section is implausible.[36]

## IV. Briann Brandes' Account and Home Purchase

Finally, the Government alleges that Anderson[37] willfully omitted the joint money market account held by Anderson's wife and granddaughter in violation of the TRO because Item 9 (Cash, Bank, and Money Market Accounts) of Anderson's Individual Financial Statement required Anderson to list all bank accounts, "whether held individually or jointly, and whether held by you [or] your spouse." (Ex. 21.) The Court agrees.

The joint money market account, opened in 2016, was used by Briann Brandes to pay her monthly mortgage payment. She paid it out of funds she deposited in the account until the balance

---

[36] The fact that Attorney Smith failed to seek clarification of the TRO Court's orders further supports the Court's conclusion that he willfully violated the TRO. *See Greyhound Corp.*, 508 F.2d at 532 ("While a defendant is, of course, not required to seek [] clarification [of an order], a failure to do so when combined with actions based upon a twisted or implausible interpretation of the order will be strong evidence of a willful violation of the decree."). Insofar as Attorney Smith argues that the McDowell Rice October 16, 2018 explanatory letter to the FTC which stated, "Transfers of $1,000 of more since the Complaint was filed against Mr. Anderson are listed on the schedule attached hereto," is evidence of Attorney Smith's good faith belief or intent, the Court disagrees. The statement was made to FTC Counsel, not the TRO Court. The statement did not seek to clarify his interpretation. The statement was but one sentence in a five-page letter which provided explanations regarding Anderson and Montelago's financial data, spanning over twenty topics. The fact that Attorney Smith (through Attorney Orme) told FTC Counsel that Anderson was providing transfers "since the Complaint was filed against" him does not support a good faith belief in that interpretation but merely evidences his stance on the matter.

[37] The Government did not allege criminal contempt by Attorney Smith in relation to Briann Brandes' account or mortgage. (*See* Doc. 1 at 18-19.)

dropped too low after her March 2019 payment. (Ex. 39, found at Doc. 1-1 at 502.) It is true that it was not until April 2, 2019—after the TRO Court entered judgment[38]—that Anderson or his wife deposited money into the account to assist Briann Brandes with her mortgage payment.[39] (Tr. 592.) Anderson argues that the Government did not prove that he was aware of the account before April 2, 2019, and therefore he cannot be found guilty of willful contempt for failing to disclose the joint money market account. The Court finds it more likely than not that Anderson knew of the joint money market account, given his participation in Briann Brandes' home purchase and overall financial assistance provided to her. However, the Government need not prove that Anderson knew about the account; it is enough that Anderson should have known about the account and he should have known to disclose it. *See Greyhound Corp.*, 508 F.2d at 532 (willful conduct includes conduct that the defendant "should have known . . . was wrongful"). The Individual Financial Statement informed Anderson that he should disclose all bank accounts "whether held individually or jointly, and whether held by you [or] your spouse." Even if he did not have actual knowledge that his wife co-owned the account with Briann Brandes, Anderson had a duty to use his best effort to obtain that information. The joint money market account was held at the same bank that Anderson and his wife held seven of their fifteen bank accounts. Anderson could have obtained this information from his wife or the bank.

The Government also contends that Anderson failed to disclose the mortgage that he cosigned for Briann Brandes' benefit and the bridge loan associated with that purchase under Items 12, 18, 21, and 23. On this point, the Court concludes that Anderson's partial disclosure did not rise to the level of willful criminal contempt.

Item 21 (Other Amounts Owed by You, Your Spouse, or Your Dependents) requested Anderson "[l]ist all other amounts, not listed elsewhere in this financial statement, owed by you, your spouse or your dependents." Item 24 requested "[d]ocumentation for all debts listed in Item 21." Under Item 21, Anderson listed a "CONTINGENT LIABILITY CO-SIGNED NOTE" and attached the Uniform Residential Loan Application he signed on June 19, 2018, to co-sign the purchase of the residence. (Ex. 1048; Tr. 89-90.) The purchase price was $227,000, and the

---

[38] FTC Counsel filed the Proposed Stipulated Order for Permanent Injunction and Monetary Judgment on March 7, 2019, and the TRO Court entered judgment on March 13, 2019. (FTC Case, docs. 263, 264.)

[39] This deposit, $600.25, originated from a joint account of Anderson and his wife. (*See* Ex. 39; Ex. 21, item 9a identifying account ending in 4020).

application identified $46,000 in equity pending from the sale of Briann Brandes' prior home and a loan amount of $181,600. On June 28, 2018, Anderson provided Briann Brandes with a bridge loan, and on July 9, 2018, after her mortgage loan was funded with proceeds from the sale of her prior home, the money was returned to Anderson's account. (Tr. 95-98; Ex. 76 at 1978-81.)

The Government acknowledges that Anderson disclosed that he cosigned the 2018 mortgage under Items 21 and 24 on his Individual Financial Statement, but nevertheless argues that Anderson willfully omitted the existence of the mortgage or his ownership of the property. Best practice would have been to include the Closing Disclosure Anderson signed on July 2, 2018, which would conclusively establish the same information provided in the loan application (i.e., the loan amount, Anderson's approved status as co-signer, property information, etc.). (*See* Ex. 1053.) However, the Court finds that Anderson's disclosure of a "CONTINGENT LIABILITY CO-SIGNED NOTE" and corresponding loan application attachment does not amount to willful criminal contempt.[40]

Likewise, the Court finds that nondisclosure of the bridge loan was not willful as required for a criminal contempt conviction. The bridge loan was not responsive to Items 12, 18, or 21.[41] It was responsive to Item 23,[42] the Transfer of Assets item discussed more thoroughly *supra*, which

---

[40] Insofar as the Government suggests that Anderson purchased the residence and sold or transferred it to his granddaughter in 2018 and failed to disclose as much, the record lacks any evidence to support that claim. (*See* Ex. 1052 (general warranty deed from third party to Briann); Ex. 1055 (deed of trust); Ex. 39 (account she used to pay the mortgage).) Moreover, the Government's forensic accountant admitted that Anderson was only contingently liable on the mortgage but possessed no ownership interest in the property. (*See* Doc. 63-1 ¶ 164; Tr. 89-90.)

[41] The Court disagrees that Items 12 (Amounts Owed to You, Your Spouse, or Your Organization), 18 (Real Property), and 21 (Other Amounts Owed by You, Your Spouse, or Your Dependents) called for disclosure of Anderson's bridge loan to Briann Brandes. Item 12 called for amounts owed to Anderson, his spouse, or his dependents; however, the record conclusively establishes that the bridge loan was repaid in July 2018 and Anderson's financial disclosures (submitted September 24) were not due until October 2018. (Ex. 1049.) Item 18 requests a list of real property interests, which plainly does not call for disclosure of a short-term loan that had already been repaid. Item 21 asked Anderson to list amounts owed by Anderson, his spouse, or dependents—again, this item plainly does not call for disclosure of the short-term loan that Anderson provided.

[42] Moreover, the TRO itself directed Anderson to provide "a list of all assets valued over $1,000 transferred, liquidated, converted, encumbered, pledged, loaned, sold, assigned, spent, withdrawn, or otherwise disposed of since the date of the filing of the Complaint in this action[.]" But, Attorney Smith advised Anderson that he needed to disclose only loans made after September 24, 2018. (Ex. 1028.) In addition to the reasoning stated herein related to Item 23, the Court would also find nondisclosure under this portion of the TRO as not willful for this reason.

31

instructed Anderson to list persons (and total amount transferred) to whom he "transferred, in the aggregate, more than $5,000 in funds . . . during the previous five years by loan, gift, sale, or other transfer," excluding transfers that were for adequate consideration. Anderson did identify Briann Brandes as one of these individuals, and he disclosed that he gifted $161,000 to Briann Brandes during the relevant time period. That figure did not include the bridge loan. The Court rejects Anderson's contention that because the $181,600 bridge loan that was repaid in July 2018, it was a transfer for adequate consideration and therefore its exclusion was proper. Item 23 specifically requested amounts loaned in the previous five years. However, the nature of this loan was tremendously short term (a few weeks). And, as FTC Counsel acknowledged, bank account statements and loan documentation negated any obfuscation. (Tr. 447). Anderson's bank statements produced to the FTC did identify a $181,600 wire transfer from Anderson's account to a title company and series of credits reflecting the complete repayment (with loan reference) in July 2018. (Ex. 76 at 1978-80.) The TRO was meant to secure and protect assets for restitution. In the case of the bridge loan, the loaned asset was absent from Anderson's account for less than a month; it returned to his account by July 9, several weeks before the FTC moved to amend its complaint to include Anderson. Given these facts, the Court finds that Anderson's nondisclosure under Item 23 was not willful. *See Wright*, 80 F.3d 1248 ("Willfulness means a deliberate[, volitional,] or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of any order[.]").

## Conclusion

Orders duly entered by a district court must be followed and respected. Persons or parties who do not do so, and who instead opt for willful deceptive gamesmanship or otherwise act in bad faith in complying with a district court's orders are subject to criminal sanction.

Attorney Smith's extensive history with Anderson and the deceptive mailer enterprise that was at the core of the FTC investigation placed Attorney Smith at the center of the financial disclosure orbit. Attorney Smith acted as the architect of the disclosures within his law firm and his representation of Anderson, orchestrating which documents to disclose and how to portray certain transactions and relationships to the FTC. In doing so, Attorney Smith pointed the finger at his law partners, his client, and his client's accountant to avoid his own personal entanglement in the FTC Case.

When an attorney sanitizes, rather than organizes, financial records for court-ordered disclosure, it is unprofessional, unethical, and (especially when performed by a well-accoladed attorney like Attorney Smith) it serves as a poor role model for the legal community. Attorneys bear a special and important responsibility to the court as well as their clients, the public at large, and the rule of law itself. As this case illustrates, when an attorney and a client become intimately involved both personally and financially, special attention and care must be given to the attorney's professional responsibilities and duties. Where personal and professional interests may converge, an attorney's professional and ethical duties and responsibilities should always prevail. The evidence presented at trial in this case shows that Attorney Smith failed to abide by these principles.

Attorney Smith advised Anderson not to disclose their business partnership in SSL Nevada even while the entity was still collecting residual assets and Attorney Smith continued to hold SSL Nevada out to be an active entity. He went a step further, closing the associated bank account amid the FTC Case in an attempt to cover his tracks. Attorney Smith orchestrated the swap of Defendants' luxury homes with minimal documentation—another move deployed to benefit Attorney Smith. Disclosure of the assignment document drafted and held by Attorney Smith could have explained the transaction to the FTC; however, Attorney Smith purposefully disclosed the Puerto Vallarta condominium instead in an unresponsive and cryptic manner (93 pages in Spanish). Finally, there was the backdated purchase agreement for a luxury car by Anderson as trustee. At best, Attorney Smith was willfully blind to the transaction; at worst, he knew at least about the Trust's purchase of the car, but advised nondisclosure based upon an implausible interpretation of the TRO.

Anderson, though apparently misguided by Attorney Smith's advice, is still not without fault. It was incumbent upon Anderson to ensure that his and his entities' disclosures were truthful, accurate, and complete. And, even when directly apprised of the fraudulent nature of the backdated luxury car purchase—and the unambiguous reasoning to shield the asset from the FTC—Anderson still looked the other way.

Defendants' conduct illustrates a picture of deception and sanitization of particular relationships and assets from the FTC's view. And that conduct affected settlement negotiations in the FTC Case—the FTC expressly relied upon the truthfulness, accuracy, and completeness of

33

Anderson's sworn financial statements and disclosures in agreeing to suspend over two-thirds of the $114,776,732 stipulated judgment.

For these reasons, the Court **FINDS**, **ORDERS** and **ADJUDGES** that Charles Floyd Anderson and Robert Pete Smith are **GUILTY** of criminal contempt as charged.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED:  March 16, 2026

34